**CLEARWATER FINISHING COMPANY, a Division of United Merchants and Manufacturers, Inc., Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

No. 81–1237.

United States Court of Appeals, Fourth Circuit.

Argued Oct. 8, 1981.

Decided Jan. 28, 1982.

Lawrence E. Blatnik, Washington, D. C. (William A. Lubbers, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Robert E. Allen, Acting Associate Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel, Allison W. Brown, Jr., Washington, D. C., on brief), for respondent.

Before FIELD, Senior Circuit Judge, and ERVIN and CHAPMAN, Circuit Judges.

CHAPMAN, Circuit Judge:

## I.

This is an appeal from the decision of the National Labor Relations Board (the Board) affirming the order of an administrative law judge which found petitioner, Clearwater Finishing Company (the Company) in violation of §§ 8(a)(1) and 8(a)(5) of the National Labor Relations Act, (29 U.S.C. § 151 et seq.). The Board found the Company in violation of § 8(a)(1) in the following particulars: (1) inducement of a union (Machine Printers and Engravers Association of the United States) to abandon a certified unit; (2) solicitation of a reward for employee surveillance of union meetings; and (3) disparate treatment of union and nonunion employees. The Company was also held in violation of § 8(a)(5) for refusing to bargain in good faith. Bad faith was evinced by failure to allow dues checkoff and dilatory tactics during bargaining as well as in the above mentioned violations of § 8(a)(1).

The administrative law judge's order, which was adopted by the Board, requires the Company to cease and desist from (1) refusing to bargain in good faith; (2) urging union representatives to abandon the certified unit; (3) refusing to grant retroactivity; and (4) soliciting employees to attend union meetings. The Company was also required to take the following affirmative action: (1) bargain in good faith upon request by the Union; (2) make whole the represented employees for lost wages, plus interest, due to the Company's refusal to grant the proposed wage increase retroactively; (3) post a notice to employees that

Robert L. Thompson, Washington, D. C. (Elizabeth F. Reveley, Elarbee, Clark & Paul, Atlanta, Ga., on brief), for petitioner.

unfair labor practice violations had been found; and (4) notify the Regional Director as to compliance. Enforcement is granted in part and denied in part.

Clearwater Finishing Company is a division of United Merchants and Manufacturers, Inc. and is engaged in the printing and finishing of textile products in its Clearwater, South Carolina plant. The Union has represented a group of skilled laborers in this plant since 1929. On March 1, 1979, the Union was authorized to represent a certified class of unskilled employees (backhelp) at the Clearwater plant. The Union, by letter of March 5, requested collective bargaining on behalf of the backhelp. On April 4, 1979, union representatives Phillips and Millwood, and company representative Carter, met to determine what benefits the backhelp were presently receiving. Phillips testified that Carter had stated that the Union should walk away from the backhelp in return for a guaranteed wage for the printers. Carter denied making such a statement, and Millwood could not remember it being made. The administrative law judge, however, credited Phillips' testimony on this subject because his memory was more precise.

Allegations of a similar statement made by Carter appear in the testimony of Phillips and another union representative, Griner, surrounding a meeting in late July. This time Carter admits making a somewhat analogous statement, but claims that it was taken completely out of context.

On April 25, the day of the first bargaining session, the Company announced that a pay raise would be given to all unrepresented employees effective July 9. The next meeting date was set for June 7 and 8, but was rescheduled by the Company for June 14 and 15. At this meeting the Union asked for a 10 percent wage increase as well as other economic and work related benefits. All but eight issues were resolved at this meeting, one of which was the wage increase. Later in June, when the Union learned that the unrepresented employees' raise would be 8.6 percent, Phillips called Company official Dunham and asked

whether the raise would be retroactively applied to the Union if it took an 8.6 percent increase. Dunham stated that he could see no problem with the request, but that Carter would have to pass on it. When asking the same question of Carter on June 29, Phillips was told that the issue of retroactivity was negotiable. The next formal negotiating session was set for early July, near the date the 8.6 percent raise was to take effect, but this meeting was cancelled by the Company.

During the next meeting on August 9 and 10, the Company submitted it's analysis of the economic package offered by the Union as $216,000. The Union stipulated that the Company backhelp was making more than backhelp in other plants represented by the Union. The Company then suggested the 8.6 percent raise without retroactivity, annual dues checkoff if the Union would bear the accounting cost and offered to sign a contract identical to one the Union had with a Company competitor. The Union declined to accept these proposals. Phillips testified that the Company had been willing in the past to grant retroactivity in this context. He further testified that the Company gave no reason for its refusal to grant retroactivity in this case other than to say it would not be in the Company's best interest. When Phillips questioned the Company's inability to pay as a plausible reason for this denial, the Company representatives informed him that this was not the case. Retroactivity would have added another $10,000 to the cost of the contract. The meeting was adjourned without agreement on these issues.

September 4 was the date of the next meeting, at which the Union offered to accept all formerly unresolved issues in exchange for Company acceptance of dues checkoff and retroactivity. The Company refused. The administrative law judge specifically found that the Company allowed checkoff for the printers and that there was room on its check stub for the backhelp employees. This evidence, as. well as the fact that United Merchants allowed checkoff in many other plants, developed from

discussions at this September 4 meeting. The Company then agreed to sign a contract if the Union demand for retroactivity was dropped.

By letter of September 13, the Union requested that retroactivity be submitted to arbitration, but on September 19 the Company refused.

The next meeting was held on September 27, when the Union proposed a three-year contract with retroactivity, checkoff and the same benefits that non-union employees would receive. The Company rejected this proposal, but offered to sign a contract without checkoff and retroactivity. The Union refused to accept this offer, but agreed to submit this proposal to the Union as the Company's final offer at a meeting on September 29. Phillips agreed to report the results to the Company, but stated in his testimony that he intended to honor his promise only if it was in the Union's best interest.

On September 28, Randall, a member of the backhelp class, contacted Huckabee, his immediate supervisor, about getting a day off to race his automobile. Huckabee, a member of the Union himself, said he thought that it could be arranged. Huckabee then asked Randall to go to the Union meeting and report what happened. Huckabee promised to meet Randall for dinner and drinks after the meeting. At the meeting Randall reported this scenario to the Union officials who told him to report the results to Huckabee. This he did, but was unable to meet for the promised drinks and dinner because his car broke down.

The backhelp voted to reject the contract, but did not authorize strike action. Union representative Griner informed the Company of this action on the evening of the 29th. On October 1, the Union repeated its September 27 offer and informed the Company of its intent to file unfair labor practice charges. The charge was filed October 18. The Company rejected the Union offer on November 13.

## II.

The standard of review for decisions of the NLRB was set out in *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951), ". . . a reviewing court is not barred from setting aside a Board decision when it cannot conscientiously find that the evidence supporting that decision is substantial, when viewed in the light that the record in its entirety furnishes, including the body of evidence opposed to the Board's view." Thus, the question becomes whether there is substantial evidence on the record as a whole to support the Board's findings of violations of §§ 8(a)(1) and 8(a)(5).

■ There appears to be little factual dispute surrounding the refusal to grant a retroactive pay increase or the solicitation of employees. The only dispute is as to the proper inferences to be drawn from the evidence presented. This Court may not substitute its judgment for that of the NLRB in cases where different inferences may reasonably be drawn from the same evidence, even if we would have decided the case differently had the matter been before us *de novo*. *NLRB v. A. S. Abell Co.*, 327 F.2d 1 (4th Cir. 1964). We, therefore, must accept the conclusions of the Board if they may reasonably be inferred from the evidence in the record. We conclude that it is possible to infer from the evidence presented that the actions of the Company were intended to interfere with the exercise of employees' rights to representation, and as such were evidence of bad faith bargaining.

■ There is substantial conflict in the testimony as to the statements made by Company representative Carter at the April 4 and July 25 meetings, which gave rise to the charge that the Company was trying to induce the Union to drop the backhelp by offering greater benefits to another unit already represented by the Union. The administrative law judge specifically credited the testimony of the Union witnesses on the events of these meetings because their memories were more precise and they corroborated each other's version of what was said. Credibility of witnesses is the province of the Board and such judgments will

not be disturbed by reviewing courts unless not supported by substantial evidence on the record as a whole, *NLRB v. Huntington Hospital, Inc.*, 550 F.2d 921 (4th Cir. 1977). The administrative law judge gives specific reasons for his determinations of credibility which are supported by substantial evidence. Thus, we are bound by his determination and must accept as true that the statements attributed to Carter by the Union witnesses were in fact made. From these statements it is reasonable to infer that the Company was attempting to induce the Union to abandon the backhelp by offering greater benefits to a unit already represented by the Union in violation of § 8(a)(1). The same evidence supports the Board's findings that these statements constituted bad faith bargaining.

### III.

Appellant contends that the Board violated the Administrative Procedures Act (5 U.S.C. § 554(b)(3)), its own regulations (29 CFR 102.15) and due process of law by relying on certain facts not alleged in the complaint in finding bad faith bargaining on the part of the Company. The APA requires that persons charged in administrative hearings be timely informed of matters of fact and law alleged. The Board's regulations require the General Counsel's complaint to include "a clear and concise description of the acts which constitute unfair labor practices." This Court in *NLRB v. Threads, Inc.*, 308 F.2d 1, 9 (4th Cir. 1962) held that "Evidence without supporting allegations cannot serve as the basis of a determination of an unfair labor practice."

■ In the present case the General Counsel's complaint alleged only three specific violations of § 8(a)(5). The administrative law judge found, in addition to the enumerated allegations, evidence of the Company's bad faith in unreasonably withholding dues checkoff, dilatory tactics during bargaining and circulation of an employee handbook containing an antiunion statement. We hold that this finding falls squarely within the prohibition outlined in *Threads* and is, therefore, invalid. How-

ever, the effect of such a holding is minimal. There are ample substantiated findings mentioned above from which the Board might reasonably infer bad faith bargaining on the part of the Company. The finding that the non-alleged facts are evidence of the Company's bad faith is merely cumulative. It is significant that the recommended order of the administrative law judge, adopted by the Board, does not mention the non-alleged facts. This indicates that these facts were not a necessary element to the Board's finding of bad faith and requires no action by this Court.

### IV.

■ Finally, the Board's order that the Company grant the proposed wage increase retroactively is beyond the scope of its authority as set out in *H. K. Porter Co. v. NLRB*, 397 U.S. 99, 90 S.Ct. 821, 25 L.Ed.2d 146 (1970). As recently recognized by this court in *Procter and Gamble Co. v. NLRB*, 658 F.2d 968, 988 (4th Cir. 1981), *H. K. Porter Co.* stands for the proposition that the Board has no authority to order agreement on mandatory subjects of bargaining. It is more than clear here, that whether the proposed wage increase would have retroactive application was an element of the collective bargaining agreement being negotiated at the time of the violations. Indeed, at one point during negotiations retroactivity was the only term upon which agreement could not be reached. Thus, the Board had no authority to order agreement on that term.

■ The Board cites several cases which purport to limit the application of the rule in *H. K. Porter* to cases involving violations of § 8(a)(5). However, the cited cases do not involve a Board order which requires agreement on a term about which negotiations had taken place. We think that the rule of *H. K. Porter* applies equally to orders requiring agreement on subjects of bargaining in cases arising under § 8(a)(1) and 8(a)(5).

We, therefore, grant enforcement of the Board's order except as to that part which orders retroactive application of the proposed wage increase.